Judge Ghaham
delivered Hie opinion of the Court.
This controversy depends upon the construction which ought to be given to the will of Nathan Adams, deceased. The will is dated 9th of February, 1835, and the testator died in November, 1845.. The fourth clause and only portion of the will which bears on the ques-. tion in issue reads thus: “It is my will that, after my-death, all my negroes, viz: Mary, about 25 years old. and her child, now about two months old; David, about 23 years; Jacob, about 21; Fanny, about 13; Frank, about 9; Henry, about 8; Edward, about \;: John, about *70 6; and Joel King, about 2, shall be and they are hereby declared to be free upon the following conditions: that they be placed under the care of my nephew, James Adams, who shall treat them humanely and allow them fair -wages for their labor, and when they have earned money enough to pay their own and the smaller one’s expenses, and to pay the passage of the whole to the colony on the coasts of Africa and support the whole for six months after their arrival there, then they are to be sent to that colony where they will be free, but ■should any, or all of them, refuse to go to Liberia, as ■aforesaid, each and all so refusing, are to remain slaves for life and belong to my nephew James Adams.”
A testator made his will in 1835, died in 1845. By his will he declared that all his slaves, naming them, “shall be and they are hereby declared to.be free” (upon condition (hat they should elect to go to Liberia! be placed under the care of the testator’s nephew, until a fund to pay their passage and sustain them six months in Africa should be raised. Two borifbetweenthe date of the will und the death of the testator. tefbonfchildren ofeeiect^ ¶ thewilL
*70 Between the date of the will and the death of the testator, the negro woman Mary had two other children, named James and William.
After the death of Nathan Adams, his nephew James took possesison of all the negroes, aforesaid, and kept them until his death. By his will he emancipates a negro man, (the only slave he owned, unless those in ■controversy be his,) and makes no allusion, in any part ■of his will, to any other slaves.
The executors appointed by the will of Nathan Adams having failed to act, Kelly was appointed administrator with the will annexed. He is also the executor ■of the will of James Adams, deceased. Kelly having refused to account for the young negroes James and William, the heirs and devisees of James Adams, exhibited their bill, in which they insist that James and William are slaves, and the executor should be required to distribute them. Kelly insists that, by the will of Nathan Adams, they are free, and makes them defendants to his cross-bill, which they, by a guardian, ad litem, answer-, making their answer a cross-bill against the complainants, electing to go to Liberia, and asking a decree declaring them free.
A will being a written instrument intended to carry out, after a man’s death, his desires and intentions at the time of making it, the leading rule in the construction of wills, is to ascertain what that intention was. To *71 do this, the object and motives which influenced him to make a will are entitled to much consideration, and to ascertain that intention, the Court should not be confined, either to strict grammatical construction, or to the literal import of the language used. No one can read the will of Nathan Adams, without coming at once to the conclusion, that it was his intention to emancipate all his slaves. He sets out with the declaration that all his negroes 'shall be free after his death, and then naming every one, old and young, even down to one about two months old; enjoins his nephew to treat them humanely, allow them fair wages for their labor, and when they (the negroes named -in the will) have earned money enough to pay their own and the „ . t., . , smaller ones expenses and their passage to Liberia, and support the whole for six months, they are to be sent to that colony. These expressions, we believe, indicate, beyond doubt, that the testator intended that all the slaves he might own at his death should be free. It would be exceedingly difficult to suggest a satisfactory reason why he should free all that were in being, and in the same instrument, which so clearly developes his benevolent feelings towards his slaves, should intend that after born children of the manumitted mother, should be separated forever from that mother’s care.
The testator’s declaration, during the ten years which elapsed from the date of the will to his death, cannot,, perhaps, be used to elucidate the meaning of his will,, but it is not improper to say, that, at least, he ever afterwards acted under the belief that the will freed all his slaves. Upon the whole case, we are of opinion that the Circuit Court did not err in decreeing that the said James and William are free on condition of going to Liberia. The complainant’s bill was properly dismissed. There was no error in refusing permission to-file his amended bill, bringing other parties before the Court. Should any of the slaves refuse to go Liberia? the complainants will not be precluded from asserting any claim they may have to them as slaves.
Wooldridge and Stites for plaintiffs; Gray for defendant.
The decree of the Circuit Court is therefore affirmed.